UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DEMETRIOUS DANIELS a/k/a
DEMTRIOUS DANIELS,

                                    Plaintiff,                          14-CV-02354 (SN)

                    -against-                                           OPINION AND ORDER

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 3/5/2015 __

**SARAH NETBURN, United States Magistrate Judge:**

*Pro se* plaintiff Demetrious Rochelle Daniels brings this action pursuant to Section

205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the

final determination of the Commissioner of Social Security (the "Commissioner") denying her

application for Supplemental Security Income ("SSI"). The Commissioner moved for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Because substantial evidence supports the administrative law judge's decision and she

did not commit legal error requiring remand, the Commissioner's motion for judgment on the

pleadings is GRANTED, and the case is dismissed with prejudice.

## PROCEDURAL BACKGROUND

Daniels filed an application for SSI on September 22, 2010. She alleged a disability onset

as of February 1, 2009 due to Hepatitis C, Human Immunodeficiency Virus (HIV), and leg pain.

On February 15, 2011, the Social Security Administration ("SSA") denied her claim, finding that

Daniels was not disabled as of her SSI application date. Daniels requested a hearing before an

administrative law judge ("ALJ"). (AR 103-05.) On September 23, 2012, Daniels appeared *pro*

*se* at a hearing before ALJ Sheena Barr. (AR 66-99.) Medical expert Dr. Gerald M. Greenberg testified in person and vocational expert Raymond E. Sestar testified telephonically. On November 25, 2012, the ALJ issued a decision finding that Daniels was not disabled within the meaning of the Act. Daniels appealed the decision, and the Appeals Council denied her request for review on June 17, 2013, making the SSA decision final. On March 4, 2014, the Appeals Council granted Daniels an extension of time to file a civil action.

Daniels filed a claim in this District on March 26, 2014. The Commissioner filed an answer on August 1, 2014, and moved for judgment on the pleadings on September 26, 2014. Daniels did not oppose the motion. On February 10, 2015, because the Administrative Record (the "record") lacks any reports or opinions of a treating physician, the Court issued an Order instructing the Commissioner to identify what evidence in the record establishes the ALJ's efforts to develop the record in light of Daniels' *pro se* status. On February 20, 2015, the Commissioner filed a responsive letter, and the Court considers the matter fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the record.

## I.     Relevant Medical History

Daniels was born on March 3, 1964.

### A.     Longitudinal Treatment with Woodhull Medical and Mental Health Center

Between March, 2009 and January 4, 2011, Daniels received her primary healthcare from Woodhull Medical and Mental Health Center. During that time, Daniels frequently missed her monthly appointments but had at least fourteen appointments with various Woodhull practitioners.

### 1.     Evidence Before Daniels's September 22, 2010 SSI Application Date

On March 18, 2009, Daniels met with Dr. Usha Mathur-Wagh. Dr. Mathur-Wagh reported that Daniels had a history of alcohol and drug abuse and had been in a car accident. Daniels had tested positive for HIV on February 11, 2009, and her blood work revealed a T-cell CD4 count of 281 and a viral load of 13,871.[1] Dr. Mathur-Wagh started Daniels on the antiretroviral drug ("ARV") Atripla. Daniels complained of night sweats, a cough and scratchy throat, fatigue, a depressed mood, and having sleep disturbance. Upon physical examination, Dr. Mathur-Wagh found that Daniels appeared her stated age, was alert with normal affect, was oriented to three spheres, had no evidence of a thought disorder, retained full motor strength, and had a full range of motion. Daniels reported that she had been in an inpatient detoxification program for 21 days and now would be in an outpatient program for six months. (AR 195-96.)

On April 15, 2009, Daniels met with Dr. Mathur-Wagh, who noted that Daniels was tolerating her new medication Atripla well. Daniels reported feeling stronger but complained of having leg cramps on and off for the last month. (AR 197-98.) On July 7, 2009, Daniels met with Dr. Mathur-Wagh, who again noted that Daniels continued to tolerate Atripla well. Daniels described feeling stronger, having a good appetite, and that her weight was stable. She complained of pain in both knees that Motrin was not relieving. She also complained of fatigue and a depressed mood. (AR 199-200.)

---

[1] The terms "CD4 cell" and "T-cell" both refer to the same type of cell, a CD4 T lymphocyte cell. See HIV-AIDS Basics, U.S. Dep't of Health & Human Services, available at https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last visited on January 26, 2015). See also 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00(F)(2). A normal CD4 count ranges from 500-1,00 cells/mm in adults. Id. A CD4 count of fewer than 200 cells/mm is a likely indicator that HIV has progressed to stage 3 infection, or AIDS. Id. The lab report indicates that Daniels's total T-Cell count was 1142.9, but that her CD4 count was 350.3. (AR 217.)

On September 14, 2009, Daniels met with Dr. Mathur-Wagh and complained of a sore throat. Otherwise, the report showed no change. (AR 201-02.) At Daniels's visit on October 14, 2009, Dr. Mathur-Wagh reported that Daniels remained anemic, and Daniels complained of a depressed mood. (AR 203-04.) On January 5, 2010, Dr. Mathur-Wagh noted that Daniels was suffering from Hepatitis C and anemia, and that her Hepatitis C viral RNA was high. Daniels complained of a poor appetite and had lost weight. She denied alcohol, drug, or methadone use but reported that she smoked six to seven cigarettes daily. (AR 206-06.)

Daniels's next appointment was on May 12, 2010. She was seen by Valerie Santangelo, a nurse practitioner ("NP"). Santangelo reported that Daniels was tolerating Atripla well, that she remained anemic, and her Hepatitis C viral RNA was high. Daniels was not taking her iron ("Fe") supplements but reported being 100% compliant with her antiviral medication. Santangelo prescribed a trial of Promar for her anemia in lieu of the iron supplements. Daniels also complained of chronic knee and lower back pain, which Motrin and Naprosyn were not helping, so Santangelo gave her a trial of Celebrex. Santangelo reviewed a smoking cessation plan and counseled Daniels on treatment options for Hepatitis C. Daniels indicated she was not ready to start Hepatitis C treatment because she wanted to work on her mental health issues first. (AR 207-09.) Dr. Cesar Del Rosario conducted lab work the same day. (AR 215-17.)

On July 13, 2010, Daniels was again seen by NP Santangelo. (AR 210-14.) Santangelo noted that Daniels was tolerating Atripla well and liking Promar for anemia. Santangelo noted that Daniels's substance abuse anxiety disorder was in remission following Suboxone treatment. Daniels was still very anemic and had a high Hepatitis C viral RNA count. Daniels complained of general malaise, but had no complaints of dyspnea, fatigue, depressed mood, or nervousness. She was smoking three to four cigarettes daily.

A Woodhull printout, dated August 3, 2010, lists Daniels's prescriptions: Ambien for sleep, Atripla to combat infection, Celebrex for pain, Clonidine for anxiety, Motrin for back pain, multivitamins for health, Nicoderm patch to quit smoking, Suboxone for pain and to treat her previous substance dependence, and Zoloft for depression. (AR 268-69.)

### 2. Evidence After Daniels's September 22, 2010 SSI Application Date

On September 29, 2010, Daniels had an appointment at Woodhull; the reports do not state which practitioner she saw. The notes indicate that Daniels continued to tolerate Atripla, was still anemic, had a high Hepatitis C viral RNA load, and had lumbago. She was smoking three to four cigarettes daily. Daniels was oriented, appeared her stated age, displayed no evidence of a thought disorder, had a full range of motion, a normal gait, and 5/5 strength. Daniels complained of chronic knee and lower back pain and was given a prescription for Ultram. Daniels had previously been referred to a Hematology practice but missed her appointment and was given another. The provider discussed with Daniels general HIV education, goals of treatment adherence, substance abuse/harm reduction counseling, smoking cessation, and the importance of diet and nutrition. (AR 189-91.) Dr. Cesar Del Rosario conducted lab work the same day and the tests indicated that Daniels's CD4 count was 350.3, outside the normal reference range. (AR 218-20.)

On October 26, 2010, NP Santangelo completed a form labeled Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) infection. The report confirmed that Daniels has HIV. Santangelo indicated that Daniels had marked limitations of activities of daily living and chronic fatigue due to severe anemia. (AR 186-87.)

On November 9, 2010, Daniels met with NP Santangelo and Stephanie Exavier, a registered nurse ("RN"), as a walk-in after missing several scheduled appointments. Daniels

complained of a sore throat and cough. Santangelo indicated that Daniels was negative for headaches, depress mood, nervousness, and sleep disturbances. Daniels appeared her stated age, was oriented to three spheres, had a normal affect, and displayed no evidence of a thought disorder. Daniels had missed her hematology appointment again and was referred for another. She was counseled on her treatment options for Hepatitis C, but Daniels indicated she wanted to get her anemia, depression, and her substance abuse stable before addressing her Hepatitis. (AR 192-95.) A Woodhull chart, updated by NP Santangelo, indicates that Daniels's medications included Ativan for anxiety, Atripla for infection, Celebrex for pain, Clonidine for anxiety, Nicoderm for smoking cessation, Suboxone, and multivitamins for health. Daniels requested a Xanax prescription, but Santangelo indicated that Dr. Chaudhry would not prescribe Xanax along with Suboxone. Santangelo prescribed Zithromax and Mucinex for Daniels's cough and cold. (AR 272-77.)

On January 4, 2011, Daniels saw NP Santangelo and nurse assistant Marilyn Lopez. Daniels indicated that she had no complaints and was feeling a lot better. Her appetite was good and she was sleeping well. She responded negatively to feelings of depression or hopelessness, having less interest or pleasure in doing things, or feeling down. She had missed her hematology appointment again. (AR 279-91.) Lab work conducted the same day indicated that her CD4 count was 296.0, outside the normal reference range. (AR 287.)

Two reports, either dated January 19, 2011 or February 18, 2011, and either March 29, 2011 or April 28, 2011, by Dr. Faisal Chaudhry, list Daniels's prescriptions. (AR 292-93.) On May 26, 2011, Daniels saw NP Santangelo and RN Exavier. Daniels denied feeling hopeless or depressed. She reported having a good appetite, sleeping well, and smoking two to three cigarettes daily. (AR 301-05.) NP Santangelo listed Daniels medications as: Ambien, Ativan,

Atripla, Buprenorphine/Naloxone, Clonidine, Ferrous Sulfate, Fluvocamine Maleate, Lac-Hydrin

lotion, Lotrisone cream, Soloraze gel, Zyrtec, and B-50 vitamin and multivitamin tablets.

(AR 305.) A lab report from May 26, 2011 indicates that Daniels's CD4 count was 264.6,

outside the normal reference range. (AR 294-99.)

On June 28, 2011, Daniels saw RN Exavier and NP Santangelo. Daniels denied having a

depressed mood or feelings of hopelessness. She reported that her appetite was good and she was

sleeping well. She still had not gone to her hematology appointment. She was smoking four

cigarettes daily. Her medications were listed as: Ativan, Atripla, Celebrex, Clonodine, Nicoderm,

Suboxone, and multivitamins. (AR 309-18.) She had lab work done the same day. (AR 319.) A

report dated August 25, 2011, documented by Dr. Chaudhry, lists Daniels's prescriptions.

(AR 321-22.)

**B.     Consultative Exams**

**1.     Dr. Herb Meadow, Industrial Medicine Associates, PC**

Daniels saw Dr. Herb Meadow, of Industrial Medicine Associates, PC, for a psychiatric

evaluation on January 24, 2011. Daniels arrived at the appointment by public transportation. She

reported that she lived alone and had four adult children ages 23-42. She completed the eighth

grade in regular education classes and obtained her GED. She last worked as a nursing aide

approximately 23 years ago. After taking maternity leave, she did not get her job back. She was

able to take care of her personal hygiene and does some household chores. She socialized with

her immediate family and spent time listening to music and watching television.

She indicated that she had been receiving psychiatric treatment monthly for the past two

years for depression and anxiety from Dr. Chaudhry at Woodhull Medical Center. She reported

that she takes Suboxone as she stopped using cocaine and heroin two years ago. She also takes Ambien, Ativan, Atripla, Buprenorphine, Clonodine, GoLYTELY, Lotrisone, and Promar.

She denied being depressed at the present time but reported a history of recurrent depression and having had suicidal thoughts in the past. She complained of having chronic leg and back pain and having trouble falling asleep. She reported having a normal appetite and stable weight. She had been the victim of domestic violence, which causes her flashbacks and nightmares. She described having panic attacks, which include palpitations and difficulty breathing and are usually brought on by crowded spaces. Dr. Meadow indicated that Daniels did not have agoraphobia. Daniels had manic symptoms, specific for psychomotor agitation, and a history of intrusive thoughts, but not a history of thought disorders.

Dr. Meadow found that Daniels was cooperative, her manner of relating was adequate, and her eye contact was normal. She appeared her stated age and was neat, casual, and well-groomed. Her speech was fluent and clear, her affect was appropriate, and her thought processes were goal-directed with no evidence of hallucinations, delusions, or paranoia. Her attention and memory were intact and she had average cognitive functioning, although her general fund of information was somewhat limited. Her insight and judgment were fair. He described her mood as depressed and anxious.

Dr. Meadow diagnosed Daniels with dysthymic disorder (rule out bipolar disorder), panic disorder without agoraphobia, posttraumatic stress disorder, and heroin and cocaine abuse/dependence in remission.[2] He opined that Daniels would be able to perform all tasks

---

[2] Dysthymic disorder is characterized by having "a chronically depressed mood that occurs for most of the day more days than not for at least two years." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 345 (4th ed. 1994) ("DSM-IV"). During the period of depressed mood, at least two of the following additional symptoms are present: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions,

necessary for vocational functioning. Although her symptoms were consistent with psychiatric problems, they did not appear to be significant enough to interfere with her ability to function on a daily basis. He recommended that she continue with psychiatric treatment and determined that her prognosis was fair.

### 2.   Dr. William Lathan, Industrial Medicine Associates, PC

Daniels saw Dr. William Lathan, of Industrial Medicine Associates, PC, for an internal medicine evaluation on January 24, 2011. Daniels reported that she was diagnosed with HIV in February 2009, and Hepatitis C in 2000, but she was not receiving treatment for Hepatitis C. She had used cocaine and intravenous heroin until 2008 and now took Suboxone. She still smoked cigarettes. She reported a history of depression and anxiety starting in 1995. She reported taking Ativan, Atripla, Clonodine, and Promar. She also reported that she was last employed in the 1990s. She was able to perform daily living and personal care activities.

Dr. Lathan found that Daniels's dress and affect were appropriate and that she was cooperative. Her gait and stance were normal, she could fully squat, she needed no help getting on and off the exam table, and she was able to rise from the chair without difficulty. She had full ranges of motions and finger dexterity. Her strength was 5/5, and she had no musculoskeletal or neurological dysfunction. Dr. Lathan opined that her prognosis was stable and that she had moderate restrictions for strenuous exertion.

---

and feelings of hopelessness." Id. During the two year period, "any symptom-free intervals last no longer than two months." Id. at 346.

    Panic disorder is characterized by "the presence of recurrent, unexpected Panic Attacks followed by at least one month of persistent concern about having another Panic Attack, worry about the possible implications or consequences of the Panic Attacks, or a significant behavioral change related to the attacks. Id. at 397. Agoraphobia's essential feature is "anxiety about being in places or situations from which escape might be difficult (or embarrassing) or in which help may not be available in the event of having a Panic Attack or panic-life symptoms. The anxiety typically leads to a pervasive avoidance of a variety of situations that may include being alone outside the home . . . ." Id. at 396.

### 3.    Dr. Edward Kamin

Daniels saw consultative psychologist Dr. Edward Kamin on February 1, 2011. In addition to his report, he also completed a Mental Residual Functional Capacity Assessment. (AR 248-51.) Dr. Kamin reviewed the record and opined that Daniels was not disabled. He found that she had no psychiatric hospitalizations and had been treated on an outpatient basis for depression for two years. He noted her history of cocaine and heroin use but that she stopped using two years ago and was taking Suboxone.

He noted her panic disorder and posttraumatic stress disorder, both related to her anxiety. She had panic attacks brought on by crowded spaces. She had a depressed and anxious mood and a history of intrusive thoughts. Her cognitive function was average with a somewhat limited fund of information. He noted that she was able to bathe herself, do household chores, socialize with her family, and use public transportation.

He diagnosed her with affective disorder (12.04), anxiety-related disorder (12.06), and substance addiction disorder (12.09). See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00. He opined that she also had a medically determinable impairment that did not precisely satisfy the diagnostic criteria. He found that she did not meet the paragraph B criteria: she had a mild restriction in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of deterioration. She also did not satisfy the paragraph C criteria.[3] He found that Daniels was, with a few exceptions, not significantly limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (AR 249-50.) He found that she was moderately limited in her ability to understand and remember detailed instructions, ability to

---

[3] See 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04. The paragraph B and paragraph C criteria are explored in greater detail in part II of the Discussion.

carry out detailed instructions, and ability to accept instructions and respond appropriately to criticism from supervisors. (Id.) Lastly, he found that Daniels seemed capable of performing all tasks necessary for vocational functioning.

## II.    Administrative Hearing

Daniels appeared *pro se* before ALJ Barr on September 23, 2011. The ALJ explained the benefits of having counsel and made sure Daniels knew she had a right to be represented by counsel, although the Commissioner was not obligated to provide her one. Daniels confirmed that she was aware of her right and wished to proceed *pro se*. (AR 69.) Daniels also confirmed that the ALJ had all the evidence that Daniels wanted her to consider. (AR 71-72.) Vocational expert Raymond Sestar and medical expert Dr. Greenberg also testified at the hearing.

### A.    Daniels's Testimony

Daniels testified that she lives at 498 East 138th Street, Bronx, New York in a third floor apartment. She is 47 years old, single, with grown children who live elsewhere. She completed the seventh grade but is able to read and write.

She last worked in 2006, and before that in 2002. In 2002, she was a full-time nursing aide and a housecleaner at a hospital. In 2006, she did "piece work," in which she physically put coupons in plastic bags, which then got delivered to peoples' doors. (AR 74-75.). She has not tried to find work since then. She stated that she had only worked for that limited amount of time because: "I stayed in a lot of pain and everything like my back and my knee," "I get dizzy a lot," "I'll be having blackouts sometimes," and "my hands tightened up on me." (AR 74, 76.) Her blackouts are caused by severe anemia. (AR 77.) She reported that her alleged onset date, the date she became unable to work, is February 1, 2009.

She testified that she has had anemia her entire life and takes iron pills and multivitamins for it. She feels that her prescriptions help but she is often "tired all the time" because of her anemia. (AR 79-80.) She also has HIV. When asked to identify her "treating doctor, the doctor [she] see[s] on a regular basis," Daniels indicated that she sees Valerie Santangelo once a month for regular treatment.[4] (AR 77.) She reported taking Ambien, Atripla, Celebrex, and Quinidines medications. (AR 78.) Because her anxiety medicine was not working, her prescription was changed to Klonopin two days before the hearing. Daniels felt that the Klonopin was working but that she was still anxious. She "can't stay still" and has to "move around" a lot. (AR 79.) Her hands were still "jittery, shaking" but not as badly as before taking Klonopin. (AR 80.) She did not employ any other treatment besides medication. She reported that her anxiety and depression "hasn't worsened," and the medications have made it "a little better." (AR 79-80.)

Daniels also testified that she has pain in her shoulders and her knees a lot, which is not due to arthritis. (AR 80.) She has pain every day and gets "charley horses" mostly every night that wake her up. (AR 81.) She takes Klonopin and Ambien to help her sleep but she does not sleep that much. (AR 81.) Her sleep problems are due to the charley horses, anxiety, and depression. She has low energy, sometimes has memory loss, has difficulty concentrating and focusing, and sometimes experiences a loss of interest in activities. (AR 81-82.) She does not have suicidal thoughts or hallucinations. (AR 82.) She has panic attacks that last a half hour on a weekly basis. To calm herself, she sits and rocks. She watches television but has trouble sitting through a whole movie due to problems focusing. (AR 82-83.) She also has trouble getting along with and being around other people because being around others makes her anxious. (AR 83.)

---

[4] Daniels stated that Santangelo was a doctor. (AR 77.) Santangelo is actually a nurse practitioner. (AR 207-09.)

Daniels testified that she can walk two blocks before she has to rest. (AR 84.) She can stand for "an hour to a half hour" and she likes to stand on a ramp near her apartment to get fresh air. (AR 84.) When she climbs the stairs to her third-floor apartment, she climbs a couple of steps, then takes a rest for about five to ten minutes before continuing. (AR 87.) The hearing was the longest time she had sat in one place without walking around. Usually she needs to walk around because she is "anxious all the time." (AR 85.) She reported that she cannot lift a lot of weight because of a car accident fifteen years ago. (AR 85.) She was not sure how much weight she could lift, but when she lifts a gallon of milk, she has to use her left, non-dominant hand. (AR 85-86.) In the grocery store, she walks and then sits a minute before continuing. She can lift one arm fully but can only lift the other "not too high." (AR 86.) She has no limitations in her hands or fingers. (AR 86.) She can bend over, but not all the way, and sometimes has pain in her right leg. (AR 87.)

Daniels testified that she is able to dress herself, shower, and put on socks and shoes. She cooks for herself, sweeps, mops, and does the laundry. (AR 89.) She does not have a driver's license and took public transportation to the hearing with a friend. (AR 87-88.) She regularly prays at home and reads the bible. She does not regularly visit friends or relatives and does not go to the movies or restaurants. On a typical day, she gets up, sits on the couch and drinks coffee, takes her medications, does some dishes, and stares out the window in her bedroom. (AR 89.)

## B.     Medical Expert Testimony

Dr. Gerald Greenberg testified as a medical expert and reviewed the medical evidence in the file. He testified that the record indicates that Daniels is 47 years old, has HIV and Hepatitis C, both of which are under control, and has anemia. She used heroin until 2008. She complains of pain, dizziness, intermittent sore throat and cough, and fatigue. He found that there is a

psychiatric impression of a depressed mood and sleep problems but psychiatry is not his field of specialty. (AR 91-93.)

### C.    Vocational Expert Testimony

Raymond Sestar testified as a vocational expert. Sestar identified Daniels's past work as a home health aide as 354.377-010, medium exertion, Specific Vocational Preparation ("SVP") 3; cleaner as 323.687-010, medium exertion, SVP 2; and inserter as 309.587-010, sedentary, SVP 2.[5] (AR 96.)

Sestar testified that a hypothetical person of Daniels's age, education and work experience would be able to return to Daniels's past work as an inserter. If the same person were able to do the full range of sedentary work but with only occasional interaction with the public and coworkers and only occasional supervision, the person would still be able to perform the work of an inserter. If the same person was able to do the full range of sedentary work with no interaction with the public, no tandem tasks with coworkers, and only occasional supervision, the person would still be able perform the work of an inserter. Further, that hypothetical individual could also perform other sedentary jobs such as assembler (734.687-018, sedentary, SVP 2, unskilled, of which there are 2,600 jobs regionally and 229,000 jobs nationally), a clerical worker (209.587-010, sedentary, SVP 2, unskilled, of which there are 6,500 jobs regionally and 100,000 jobs nationally), or an account person (205.367-014, sedentary, SVP 2, unskilled, of which there are 9,000 jobs regionally and 200,000 jobs nationally). These three jobs would be able to be performed by that individual whether the individual was limited to occasional

---

[5] The Dictionary of Occupational Titles (the "DOT") defines "Specific Vocational Preparation" as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html (last visited February 2, 2015).

interaction or no interaction with the public and limited to very little contact with coworkers and supervisors.

## III.    The ALJ's Determination

In her November 25, 2011 decision, the ALJ found that Daniels has not been under a disability within the meaning of the Act since September 22, 2010. At step one, the ALJ determined that Daniels has not engaged in substantial gainful activity since September 22, 2010, pursuant to 20 C.F.R. 416.971. (AR 17.) At step two, the ALJ determined that Daniels had the following severe impairments, pursuant to 20 C.F.R. 416.920(c): HIV, dysthymic disorder, history of substance abuse, and anemia.

At step three, the ALJ determined that Daniels's combination of impairments does not meet or medically equal the severity of the listed impairments (the "Listings") in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ first considered Daniels's HIV but concluded that Daniels does not have any major opportunistic infections or functional limitations pursuant to HIV Listing 14.08.[6] She next considered Daniels's chronic anemia but found that Daniels has not required one or more blood transfusions on an average of at least once every two months or had any other major complications pursuant to anemia Listing 7.02.[7]

---

[6] Listings 14.00 covers immune system disorders, including HIV. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 14.00. HIV is "characterized by increased susceptibility to opportunistic infections, cancers, or other conditions." Id. at § 14.00(A)(4). "Most women with severe immunosuppression secondary to HIV infection exhibit the typical opportunistic infections and other conditions, such as PCP, Candida esophagitis, wasting syndrome, cryptococcosis, and toxoplasmosis." Id. at §§ 14.00(A)(4)(a), 14.08 (listing various bacterial, fungal, protozoan or helminthic, and viral infections common in HIV, along with characterizations).

[7] Listings 7.00 covers hematological disorders, including chronic anemia. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 7.00. "Chronicity is indicated by persistence of the condition for at least three months." Id. at § 7.00(B). Chronic anemia requires "hematocrit persisting at 30 percent or less due to any cause" with (A) "one or more blood transfusions on an average of at least once every two months" or (B) "evaluation of the resulting impairment under criteria for the affected body system." Id. at § 7.02.

Next, the ALJ determined that Daniels's impairments do not meet or medically equal Listing 12.04 (affective disorder) or Listing 12.09 (substance abuse disorder).[8] In reviewing the "paragraph B" criteria, the ALJ first determined that Daniels has mild restrictions in the activities of daily living. This was based on the reports of consultative examiner Dr. Meadow, who indicated that Daniels takes care of her personal hygiene and does some household chores at home; and consultative examiner Dr. Lathan, who indicated she can perform all activities of personal care and daily living. (AR 18.) Second, she determined that Daniels has moderate difficulties in social functioning. The ALJ based this on Daniels's own testimony that she socializes with her immediate family, avoids crowds, and does not visit friends or relatives. (AR 18.) Third, the ALJ determined that Daniels has mild difficulties in concentration, persistence or pace. The ALJ based this on Daniels's own testimony that she watches TV and listens to music. (AR 18.) Fourth, the ALJ determined that Daniels had no episodes of decompensation of extended duration. (AR 18.) As a result, Daniels does not satisfy the "paragraph B" criteria. The ALJ also determined that Daniels does not satisfy the "paragraph C" criteria. (AR 18.)

Before continuing to step four, the ALJ determined that Daniels has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except that she is limited to only occasional interaction with the public and co-workers and only occasional supervision. (AR 18.) The ALJ first considered Daniels's testimony. Daniels dresses herself, takes care of her personal needs, cooks, shops, does housework, and takes public transportation. She avoids crowds, does not

---

[8] Listings 12.00 covers nine mental disorders. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00. Affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." Id. at § 12.04. Substance addiction disorders are characterized by "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." Id. at § 12.09.

attend religious services because she does not want to be around people, and does not visit friends or relatives. The ALJ concluded that although Daniels's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, Daniels's testimony concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 19.) The ALJ then listed other reasons why Daniels's alleged limitations are not supported by the evidence of record.

The ALJ gave "great weight" to the testimony of Dr. Greenberg, a medical expert who reviewed the entire medical record and testified at Daniels's hearing. The ALJ noted that Dr. Greenberg testified that despite Daniels's physical impairments, she has no significant problems and could perform a full range of sedentary work.

The ALJ gave "some weight" to the report of internal medicine consultative examiner, Dr. Lathan, who found that Daniels had moderate restriction for strenuous exertion but a full range of motion in the spine, joints, and hips with no sensory deficit or motor loss. The ALJ found Dr. Lathan's report vague, but determined that it and Dr. Greenberg's testimony were consistent with sedentary work that does not require strenuous exertion.

The ALJ gave "great weight" to the report of psychiatric consultative examiner, Dr. Meadow, who opined that Daniels would be able to perform all tasks necessary for vocational functioning because her mental status examination was normal. (AR 19-20.) The ALJ noted that Dr. Meadow examined Daniels at length. Along with this finding, the ALJ took into account Daniels's subjective complaints of difficulty dealing with people.

Lastly, although nurse practitioners are not acceptable medical sources, the ALJ considered the reports of NP Santangelo, who had the longest treating relationship with Daniels.

The ALJ afforded Santangelo's opinion "little weight" because she found it to be inconsistent with other evidence. Santangelo found that Daniels had marked limitation of activities of daily living as a result of chronic fatigue due to severe anemia. The ALJ found that Daniels's own testimony, along with what she reported to Drs. Meadow and Lathan, however, indicate that she is able to engage in activities of daily living.

At step four, the ALJ determined that based on Daniels's RFC and the testimony of the vocational expert, she is capable of performing past relevant work as an inserter. The inserter job requires a sedentary level of exertion and has an SVP of 2, which means that it is unskilled and can be learned in 30 days or less. Because there were other jobs in the economy that Daniels is also able to perform, the ALJ continued to step five.

At step five, the ALJ considered whether Daniels could make a successful adjustment to other work based on her RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines and the vocational expert's testimony. The ALJ determined that Daniels fits into the 45-49 age group, has limited education, is able to communicate in English, and her past relevant work is unskilled. Daniels's ability to perform the full range of sedentary work is impeded by additional limitations. The vocational expert testified that given those limitations, Daniels would still be able to perform the requirements of representative occupations such as assembler, clerical worker, and account clerk. As a result, the ALJ concluded that Daniels is not under a disability, as defined in the Act, and is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (AR 21-22.)

**DISCUSSION**

**I.      Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but

early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if,

from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec.

Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47

F.3d 14, 16 (2d Cir. 1995) (per curiam). In reviewing a decision of the Commissioner, a court

may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner . . . with or without remanding the cause for a

rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not

supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31

(2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the

Commissioner as to any fact are supported by substantial evidence, those findings are

conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904

F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder."). This means that if there is sufficient

evidence to support the final decision, the Court must grant judgment in favor of the

Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v.

Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial

evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable

factfinder would *have to conclude otherwise*" (internal citation and quotation marks omitted; emphasis in original)).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v. Astrue, 569 F.3d 108, 110 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)). The Act "must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz, 912 F.2d at 11. This is particularly true in the case of *pro se* claimants, who "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and quotations omitted). See also Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating *pro se* standard in reviewing denial of disability benefits).

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. August 21, 2012) (citing Reyzina v. Apfel, 98 Civ. 1288 (JG), 1999 WL 65995, at *13 (E.D.N.Y. February 10, 1999)). Without doing so, the ALJ deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in

any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.      Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have

> a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); Melville, 198 F.3d at 51.

If an impairment is found to be "severe" at step two, the ALJ looks to 20 C.F.R. Part 404, Subpart P, App'x 1 to determine if it qualifies as a listed impairment at step three. 20 C.F.R. § 404.1520a(d)(2). The regulations provide additional guidance for evaluating mental impairments. 20 C.F.R. § 404.1520a(c)(1). Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). For mental disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or the "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. Part 404, subpt. P, app'x 1 § 12.04(B). The first three are rated on a "five-point scale": none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area – episodes of decompensation – is rated on a "four-point scale": none, one or two, three, and four

or more. Id. The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Part 404, subpt. P, app'x 1 § 12.04(B).

## III.   Analysis

*Pro se* plaintiff Daniels appeals the Commissioner's decision on the basis that she is entitled to the SSI benefits because of her HIV, chronic anemia, and leg pain. The Commissioner has moved for judgment on the pleadings, arguing that substantial evidence supports the ALJ's decision, the ALJ satisfied her duty to develop the record, Daniels made a knowing waiver of her rights to representation at her Administrative Hearing, and the ALJ properly evaluated Daniels's credibility.

### A.   The ALJ's Duty to Develop the Record

The Court must address whether the ALJ adequately developed the record as a threshold issue. This is because the Court cannot rule on whether the ALJ's decision regarding Daniels's functional capacity was supported by substantial evidence if the determination was based on an incomplete record. The Court finds that the ALJ satisfied her burden.

When the ALJ assesses a claimant's alleged disability, she, "unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceedings." Moran, 569 F.3d at 112 (quotations omitted); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (confirming that the ALJ has an affirmative duty to develop the record, which "arises from the Commissioner's regulatory obligations to develop

a complete medical record before making a disability determination"). See also 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d). The Court, in turn, must make a "searching investigation of the record" to ensure that the claimant received "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (quotations omitted). When the ALJ has failed to develop the record adequately, the Court must remand to the Commissioner for further development. See, e.g., Pratts, 94 F.3d at 39.

Under this duty, the ALJ must "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any source on a consultative basis." 42 U.S.C. § 423(d)(5)(B). See Devora v. Barnhart, 205 F. Supp. 2d 164, 174 (S.D.N.Y. 2002); Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991). A "reasonable effort" means that the ALJ "will make an initial request for evidence" from the claimant's medical source and make one follow up request between 10-20 calendar days after the initial one. 20 C.F.R. § 416.912(d)(1). The ALJ also may ask a claimant "to attend one or more consultative examinations at [the Commissioner's] expense":

> Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. However, in some instances, such as when a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, we may order a consultative examination while awaiting receipt of medical source evidence. We will not evaluate this evidence until we have made every reasonable effort to obtain evidence from your medical sources.

20 C.F.R. § 416.912(e).

Where a claimant is unrepresented, "compliance with the minimum requirements of the regulations is not always sufficient to satisfy the ALJ's heightened duty to develop the record." Williams v. Barnhart, 05 Civ. 7503 (JCF), 2007 WL 924207, at *7 (S.D.N.Y. March 27, 2007) (collecting cases); Cruz, 912 F.2d at 11 (When a claimant is *pro se,* "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" (internal quotations omitted) (quoting Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982))). Thus, with *pro se* claimants, "reasonable efforts" to develop the record include "more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence." Jones v. Apfel, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999) (citation omitted) (remanding to develop the record where the record lacked any report from the claimant's treating physician). See also Rosa, 168 F.3d at 79. Further, the ALJ must "enter these attempts at evidentiary development into the record." Jones, 66 F. Supp. 2d at 524.

Here, the medical evidence after Daniels's September 22, 2010 application date includes reports by consultative physicians Dr. Edward Kamin, Dr. William Lathan, Dr. Herb Meadow, and reports by NP Valerie Santangelo. A fourth non-examining consultative physician, Dr. Gerald Greenberg, also testified at Daniels's administrative hearing. Drs. Kamin, Lathan, and Meadow each met with Daniels once. Dr. Greenberg reviewed the medical record and heard from Daniels herself only through her testimony at the Administrative Hearing.

NP Santangelo saw Daniels six times in the eight months after Daniels's application date (and two times before that). Of these providers, she had by far the longest relationship with Daniels. Nurse practitioners, however, are not "acceptable medical sources" under the

regulations. See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) (citing 20 C.F.R. §404.1527);

20 C.F.R. § 404.1513(a) (listing five categories of "acceptable medical sources"). Nurse

practitioners are included in the regulations' Section 404.1513(d), which characterizes "other

sources" to whom the ALJ can look to show the severity of a claimant's impairment(s) or ability

to work. 20 C.F.R. § 404.1513(d). Although the opinions of a nurse practitioner with a

longitudinal treatment history with a claimant are due some weight, they are not due the

controlling weight that a treating physician's opinions garner. See Mongeur, 722 F.2d at

1039 n.2 (stating the opinion of a treating nurse practitioner "is entitled to some extra

consideration"); Mendez v. Colvin, 13 Civ. 3618 (GWG), 2014 WL 6979043, at *10 (S.D.N.Y.

Dec. 9, 2014) (citing Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) ("Genier I")).

Although the record does not contain her opinions, numerous places in the record indicate

that Daniels had a treating physician: Dr. Chaudhry. In the Disability Report – Appeal – Form

SSA – 3441, Daniels reported that she saw Dr. Chaudhry for depression and anxiety, and that Dr.

Chaudhry prescribed her medications at Woodhull Medical and Mental Health Center from 2009

to March 2011. (AR 178-79.) In a November 10, 2010 visit, NP Santangelo noted that although

Daniels requested a Xanax prescription, Dr. Chaudhry would not prescribe it. (AR 192.) In

Daniels's consultative exam with psychiatrist Dr. Meadow, she reported that she had been in

monthly psychiatric treatment for depression with Dr. Chaudhry for two years. (AR 227.) Two

undated reports, signed and stamped by Dr. Chaudhry, in the record list Daniels's prescribed

medications. (AR 268-69.) Three "Chart Updates," dated between January 19, 2011 and August

25, 2011, indicate that they were "documented by Faisal Chaudhry, MD" and again list Daniels's

prescriptions. (AR 292-93, 321-22.) At no point in the record, however, are there any

contemporaneous treatment reports or opinions of Dr. Chaudhry. When asked at the hearing about her primary care providers, Daniels also mentioned only Santangelo. (AR 77.)

Despite this shortcoming in the record, the Court finds that the ALJ met her "heightened duty" to make "every reasonable effort" to obtain reports from Dr. Chaudhry, documented those attempts, and then sought consultative examinations when efforts to contact Dr. Chaudhry proved unproductive. Cruz, 912 F.2d at 11; 42 U.S.C. § 423(d)(5)(B). First, the ALJ made requisite initial and follow-up attempts to obtain the reports from Dr. Chaudhry on November 29, 2010 and December 7, 2010, in compliance with 20 C.F.R. § 416.912(d)(1). (AR 253.) Although an Administration's Disability Worksheet states, under "disposition," that there is "no code applicable to situation, see R/C" for Dr. Chaudhry (AR 252), the Commissioner explains that the entry was in error: because the initial and follow-up attempts were made and Dr. Chaudhry failed to respond, Dr. Chaudhry should have been coded as "source did not respond to the Commissioner's requests." (ECF No. 28 at 1.) Cf. Smith v. Astrue, 1:05 Civ. 1433 (NAM), 2008 WL 4517810, at *8-9 (N.D.N.Y. Sept. 30, 2008) (remanding where the record was bereft of any attempt to obtain the treating physician's opinion by way of letters or subpoenas).

Given the unproductive efforts to obtain Dr. Chaudhry's reports, the ALJ next sought consultative examinations, in compliance with 20 C.F.R. § 416.912(e). The record suggests that the Commissioner sent Daniels letters and called Daniels to inform her of two scheduled consultative exam appointments (AR 175), although the phone number that Daniels provided the Commissioner was out of service on several occasions. (AR 173-76.) After Daniels failed to show up at two scheduled appointments, the Commissioner again attempted to contact Daniels and her third party contact on December 30, 2010, but was unsuccessful. (AR 173-74.) Daniels then called the Commissioner on January 6, 2011, and the Commissioner advised Daniels that

she "tried to contact [Daniels] by phone and by mail and contact [Daniels's] daughter who is the third party by phone and by mail." (AR 175.) Daniels explained that she had been out of town and requested a third appointment, to which the Commissioner consented but advised "if she does not go[,] her claim would be decided with information we have on file and this will not be in her best interest." (Id.) The Commissioner also warned Daniels that she needed to inform them of any changes of address or if she was leaving town for an extended period of time. (Id.) Daniels's consultative examinations with Drs. Lathan and Meadow on January 24, 2011, and Dr. Kamin on February 1, 2011, presumably were a result of these ongoing efforts. The ALJ then had a fourth doctor, Dr. Greenberg, examine all of her medical records, listen to Daniels's hearing testimony and then testify at that hearing, as well.

The Court finds that the ALJ made every reasonable effort to develop the record, in compliance with 20 C.F.R. §§ 416.912(d)(1), 416.912(e). Although Dr. Chaudhry, as Daniels's treating psychiatrist, was better positioned to evaluate Daniels's disability than a consultative physician, the standard for the duty to develop the record is reasonableness: there is but so much that the ALJ can do beyond what she did here.

Lastly, the ALJ also satisfied her duty to inform Daniels of her right to counsel, a subcomponent of the ALJ's duty to develop the record. The Commissioner sent Daniels notices advising her of that right (AR 27, 32-33, 40-41, 44-45), and at one hearing, Daniels appeared with a representative. (AR 106.) At the final hearing, the ALJ also advised Daniels of that right. (AR 69.) Thus, there was no legal error where Daniels proceeded at the hearing without counsel. See Cruz v. Sullivan, 912 F.2d 8, 11-12 (2d Cir. 1990).

B.      **Treating Physician Rule**

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions

of a claimant's treating physician, as long as the opinion is well-supported by medical findings

and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). The

rule is inextricably linked to the ALJ's duty to develop the record. See Williams, 2007 WL

924207, at *7; Geracitano v. Callahan, 979 F. Supp. 952, 956 (W.D.N.Y. 1997) ("A

corollary . . . to the treating physician rule [is] that the decision maker [has] a duty to seek

clarification from a treating physician in the event the physician's report [is] somehow

incomplete.").

Affording a treating physician's opinion controlling weight reflects the reasoned

judgment that treating physicians are "most able to provide a detailed, longitudinal picture of

[the claimant's] medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R.

§ 404.1527(c)(2). See also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion

of a treating physician is accorded extra weight because the continuity of treatment he provides

and the doctor/patient relationship he develops place him in a unique position to make a

complete and accurate diagnosis of his patient." (quoting Mongeur v. Heckler, 722 F.2d 1033,

1039 n.2 (2d Cir. 1983) (per curiam))). By contrast, the regulations instruct the ALJ to give only

limited weight to consulting physicians' opinions because of their typically superficial exposure

to the plaintiff. See 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. Pt. 404, subpt. P, app'x 1

§ 12.00(E). See also Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2000) (the

opinion of a physician who saw plaintiff only once deserves limited weight). Only when the

treating physician's opinion is inconsistent with other substantial evidence in the record may a consultative physician's report constitute substantial evidence. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. February 4, 2011).

Where mental health treatment is at issue, the treating physician rule takes on added importance. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(E); Camilo v. Comm'r of Soc. Sec'y, 11 Civ. 1345 (DAB)(MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013); Rodriguez v. Astrue, 07 Civ. 534 (WHP)(MHD), 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009). See also Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 514 (2d Cir. 2002) ("[C]ourts should exercise an extra measure of caution when adjudicating the claims of a litigation whose mental capacity is in question."); SSR 85–15, 1985 WL 56857 (Jan. 1, 1985) (explaining that persons with mental illnesses "adopt a highly restricted and/or inflexible lifestyle within which they appear to function well" and thus, "determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult"). This is because a mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination. See Santiago v. Barnhart, 441 F. Supp. 2d 620, 629 ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing. The rule is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time." (citations omitted)). See also Canales v. Comm'r of Soc. Sec'y, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) ("Because mental

disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (citing Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994, at *7 (S.D.N.Y. December 14, 2009))).

When there is no treating physician's opinion, the Commissioner must still consider whether the consultative opinions are supported by and consistent with the other evidence in the record: "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings," and the "better an explanation a source provides for an opinion, the more weight we will give that opinion. [Further], the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 416.927(c). The Commissioner may also consider the opinions of non-examining sources, such as State agency physicians. 20 C.F.R. § 416.927(e); SSR 96-6P, 1996 WL 374180 (July 2, 1996).

Ultimately, the final decision on the issue of disability is one reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(2); see Snell, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.").

Here, the ALJ relied on Daniels' three consultative examinations, as well as the opinion of a non-examining State agency physician, and notes from Daniels's treatment with NP Santangelo. First, the ALJ gave "great weight" to the opinion of non-examining physician Dr. Greenberg who reviewed the entirety of Daniels's records and testified at trial. Although Dr. Greenberg found that Daniels has HIV, Hepatitis C, and anemia, he testified that her illnesses appear to be "under good control" and no other "significant problems" appear in her medical

files. Second, the ALJ gave "some weight" to Dr. Lathan's physical examination opinion. She noted that Dr. Lathan found that Daniels had moderate restriction for strenuous exertion but gave him a lesser weight because, in contrast to that conclusion, his results show Daniels has a full range of motion in her spine, joints, and hips. She also compared his findings to Dr. Greenberg to judge the consistency of the two. Third, the ALJ gave "great weight" to Dr. Meadow's psychiatric examination as Dr. Meadow found that Daniels's mental status examination was normal and she could perform all tasks necessary for vocational functioning. The ALJ supplemented Dr. Meadow's opinion by taking into account Daniels's own subjective account of having difficulty dealing with others. Lastly, the ALJ considered NP Santangelo's opinion but ultimately gave it "little weight." The ALJ found that NP Santangelo's finding that Daniels had marked limitation in activities of daily living was not supported by Drs. Meadow or Lathan's opinions, which documented Daniels's ability to do household chores and take care of her personal hygiene.

Thus, the ALJ adhered to the underlying principles of the treating physician rule. She compared the medical evidence in the record to assess whether the opinions were consistent with one another and consistent with Daniels's own account. In weighing all the evidence, she gave the most weight to opinions that were supported by and consistent with that other evidence.

Although the ALJ did not specifically reference Dr. Kamin's consultative exam, that omission does not require remand. Dr. Kamin's consultative exam is consistent with the substantial evidence and the ALJ's determination. Dr. Kamin noted that Daniels had been treated on an outpatient basis, with no psychiatric hospitalizations, and that she was capable of performing all tasks necessary for vocational functioning despite some mild impairments. Thus, Dr. Kamin's assessment acknowledged that "the mere presence of a disease or impairment, or

establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." Tryon v. Astrue, 5:10 Civ. 537 (MAD), 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (internal quotations and citations omitted).

### C.    Credibility Determination

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of her impairment. Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (dictating that an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the claimant's daily activities, the location, nature, extent, and duration of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 71 (2d Cir. 2013) (citing 20 C.F.R. § 415.929(c)(2)); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3). See also Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *15-16 (S.D.N.Y. July 2, 2013) (holding that the ALJ must determine the claimant's credibility in light of the objective record evidence).

SSA regulations provide that the ALJ must assess a claimant's credibility before evaluating her RFC, not the other way around. See Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("Genier II") (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (July 2, 1996)); Cruz, 2013 WL 3333040, at *16 (collecting cases). Dismissing a claimant's testimony based on its incompatibility with an RFC "gets things backwards" because it "implies that ability to work is determined first and is then used to

determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012)).

See also Molina v. Colvin, 13 Civ. 4989 (AJP), 2014 WL 3445335, at *14 (S.D.N.Y. July 15,

2014) ("Neither the Social Security regulations nor this Circuit's case law support the idea that

an ALJ may discredit a claimant's subjective complaints on the basis of the ALJ's own finding

of the claimant's RFC." (collecting cases)); Otero v. Colvin, 12 Civ. 4757 (JG), 2013 WL

1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC

prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude

that a claimant's subjective complaints are unworthy of belief.").

 Here, the ALJ wrote that she found that Daniels's statements were "not credible to the

extent that they [were] inconsistent with the above residual functional capacity assessment."

(AR 19.) Use of this boilerplate language is error. Credibility is to be measured against objective

medical evidence, not against the ALJ's assessment of a claimant's capacity. Remand, however,

is not necessary because the Court has independently compared Daniels's statements about the

intensity, persistence, or limiting effects of her impairment to the objective medical and other

evidence in the record and finds that the ALJ's credibility finding is supported by substantial

evidence. Further, despite this error, other portions of the ALJ's decision indicate that the ALJ

did consider Daniels's credibility vis-à-vis other medical evidence in the record and did credit

some of Daniels's testimony.

 For instance, the ALJ credited Daniels' own testimony to determine that she had

moderate difficulties in social functioning. The ALJ also took some of Daniels's other

complaints into account in defining Daniels's RFC: the ALJ limited Daniels's interaction with

co-workers, the public, and supervisors, and she limited Daniels to sedentary work. See Genier

II, 606 F.3d at 49 ("[T]he ALJ is required to take the claimant's reports of pain and other

limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (internal citations omitted)); 20 C.F.R. § 416.929(b) (dictating that an individual's subjective complaints alone do not constitute conclusive evidence of a disability).

Although the error does not require remand, in the future, the ALJ should assess the claimant's credibility against the objective medical evidence and *then* render an RFC assessment.

### D.       The Remaining Portions of the ALJ's Determination

In reviewing the rest of the ALJ's determinations at steps one through five, the Court finds that the ALJ's opinion is supported by substantial evidence and free of legal error, as well.

After determining that Daniels was not engaged in substantial gainful activity, the ALJ considered both Daniels's physical impairments (HIV and anemia) and her mental impairments to see if any of them met the Listings, which she explained they did not. The ALJ based Daniels's RFC on "all available evidence," including Daniels's subjective complaints and all medical evidence in the record, and considered Daniels's daily activities, the location, nature and extent of her symptoms, precipitating and aggravating factors, the effectiveness and side effects of medications taken, and other treatments undertaken to relieve symptoms. Cichocki, 534 F. App'x at 71 (citing 20 C.F.R. § 415.929(c)(2)). See also Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *15-16 (S.D.N.Y. July 2, 2013) (holding that the ALJ must determine the claimant's credibility in light of the objective record evidence). Substantial evidence supports the ALJ's conclusions that Daniels has only mild restrictions in daily living and concentration, persistence, or pace and moderate difficulties in social functioning.

Finally, the ALJ posed hypotheticals to a vocational expert that were based on Daniels's RFC and therefore took into account Daniels's limitations. The ALJ ultimately concluded, partially in reliance on the vocational expert's testimony, that there are jobs in the national and regional economy that Daniels is capable of performing. Because a claimant "can only be found disabled if [she is] unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment," the ALJ concluded that Daniels is not disabled under the Act. 20 C.F.R. § 416.927(a)(1). Substantial evidence supports her conclusion.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is GRANTED, and the case is dismissed with prejudice.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
      March 5, 2015